**NATURAL RESOURCES COMMISSION OF THE INDIANA DEPARTMENT OF NATURAL RESOURCES, Appellant (Plaintiffs Below),**

v.

**PORTER COUNTY DRAINAGE BOARD, Appellee (Defendant Below).**

No. 64A04–8911–CV–501.

Indiana Court of Appeals
Fourth District.

July 10, 1990.

Linley E. Pearson, Atty. Gen., Daniel P. McInerny, Deputy Atty. Gen., Indianapolis, for appellant.

Herbert K. Douglas, Douglas, Douglas & Hurley, Valparaiso, for appellee.

CHEZEM, Judge.

Case Summary

Plaintiffs/Appellants, the Natural Resources Commission of the Indiana Depart-

---

1. I use the word "initial" to denote the first consumer following assembly of the components.

ment of Natural Resources (NRC), appeals the trial court's denial of its application for temporary restraining order and complaint for preliminary and permanent injunction. We reverse.

### Issue

Whether the trial court properly interpreted Ind.Code 13–2–22 in denying NRC's application for temporary restraining order and complaint for preliminary and permanent injunction.

### Facts

Salt Creek runs through Porter County, Indiana, is approximately twenty-four and one-half (24½) miles long, and is a tributary of Lake Michigan. It serves as a stocking and "imprinting" site for salmon and steelhead trout and is used as a spawning run for these fish as they return to Lake Michigan. The Parker Drain is a regulated drain eight and one-half (8½) miles long. It follows Salt Creek from approximately 200 W. south and east to five-eighths (⅝) of a mile south of Division Road. Parker Drain is not an independently existing drain but an inclusive part of Salt Creek.

On July 14, 1989 Indiana Conservation Officer Lieutenant David R. Bateman discovered a dredging operation taking place on Salt Creek 2½ miles south of Valparaiso, Indiana in the creek's floodway. Upon returning to investigate the site on July 17, Lt. Bateman noted trees and brush had been cleared from the north or east side of the creek, and the spoil had been deposited on the bank. He saw several pieces of equipment along the creek, including a bulldozer and a dragline; Bill Durflinger was operating the equipment. Lt. Bateman informed Mr. Durflinger that he was to cease operation until he obtained a permit from the DNR, but that it was doubtful a permit would be issued right away, due to a moratorium on construction in the Lake Michigan tributaries because of the migration of salmon and trout upstream.

After various meetings, the Porter County Drainage Board failed to terminate the project. The application for temporary restraining order and complaint for prelimi-

nary and permanent injunction which followed are the basis for this appeal.

Additional facts will be added as needed.

### Discussion and Decision

"The issuance of a preliminary injunction is a matter which lies within the sound discretion of the trial judge. The trial court's decision may be reversed on appeal only when the decision amounts to an abuse of discretion." *State Bd. of Public Welfare v. Watkins* (1984), Ind.App., 459 N.E.2d 394, 396. (citation omitted).

■ The NRC asserts that Salt Creek is a vital segment of the Lake Michigan tributaries necessary to maintain salmon and steelhead trout populations. The sport fishery for theses species generates approximately forty million dollars ($40,000,-000) per year in economic benefits to northwest Indiana. Specifically, they assert that siltation from in-stream dredging and erosion from bank clearing, degrade water quality and destroy critical fish habitat, both at the site of excavation and downstream from it. This results in both immediate and long term negative impacts on the trout and salmon population; this was especially true at the Salt Creek excavation point because the fish were in their summer run. It is for these reasons that NRC feels it has a legitimate interest in overseeing the excavation of these areas through screening and the issuance of permits. Based on these facts, they assert that the trial court interpreted IC 13–2–22–13(d) contrary to legislative intent.

The statute in question states:

(d) Any person desiring to:

(A) erect, make, use, or maintain a structure, obstruction, deposit, or excavation;

(B) suffer or permit a structure, obstruction, deposit, or excavation to be erected, made, used or maintained; or

(C) make an addition to a lawful abode or place of residence if the addition does not increase the value of the abode or place of residence by more that forty percent (40%) and a previous addition was not made to the abode or place of residence;

in or on any floodway shall first file with the commission a verified written application for permit accompanied by a nonrefundable fee of fifty dollars ($50). The application must set forth the material facts together with plans and specifications for the structure, obstruction, deposit, or excavation, and such person must receive a permit from the commission for the work before the beginning construction. The commission shall issue a permit only if in the opinion of the commission the applicant has clearly proven that such structure, obstruction, deposit or excavation will not adversely affect the efficiency of or will not unduly restrict the capacity of the floodway, or will not constitute an unreasonable hazard to the saftey of life or property, or will not result in unreasonably detrimental effects upon fish, wildlife, or botanical resources. In deciding whether to issue a permit under this subsection, the commission shall consider the cumulative effects of the structure, obstruction, deposit, or excavation. Any permit issued by the commission under this subsection is void if construction is not commenced within two (2) years after issuance of the permit. However, authorization and approval of the commission is not required for:

(1) a reconstruction or maintenance project (as defined in IC 36–9–27) on a stream or regulated drain in an agricultural (or rural) area where the *total length of the stream or drain is ten (10) miles or less.*

(2) a construction or reconstruction project on a state or county highway bridge in a rural area that crosses a stream having an upstream drainage area of fifty (50) square miles or less. (Emphasis added).

■ The question here involves the trial court's interpretation of 13–2–22–13(d)(1). In construing the statute we must look to the legislative intent involved. *See USS, a Div. of USX Corp. v. Review Bd. of Indiana Employment Sec. Div.* (1988), Ind.App., 527 N.E.2d 731. This statute is a part of the Indiana Flood Control Act. The purpose of the Flood Control Act is to control activities within the floodways of Indiana's rivers and streams and maintain policies to control floods and preserve and protect our water resources. 13–2–22–13(b) states:

It is unlawful to erect, make, use or maintain any structure, obstruction, deposit, or excavation in or on any floodway or to suffer or permit any structure, obstruction, deposit, or excavation to be erected, made, used, or maintained in or on any floodway which will adversely affect the efficiency of or unduly restrict the capacity of the floodway or which, by virtue of its nature, design, method of construction, state of maintenance, or physical condition, will constitute an unreasonable hazard to the saftey of life or property, or result in unreasonably detrimental effects upon the fish, wildlife, or botanical resources, and the same are declared to be and to constitute public nuisance.

All statutes should be read to give effect to the intent of the legislature. *Barr v. Sun Exploration* (1982), Ind.App., 436 N.E.2d 821, 824. (citations omitted). The trial court interpreted 13–2–22–13(d)(1)'s exception to the permit requirement to include a stream *or* a drain. We acknowledge this language as clearly including a stream *or* a drain. However, to interpret the statute to allow portions of Salt Creek to go unregulated because it is designated as a drain, does not serve the purpose the legislature intended. The legislature's intent with respect to IC 13–2–22 et seq. is clearly to protect the floodway environment as a whole.

The Parker Drain is eight and one-half (8½) miles long and is embodied within twenty-three (23) mile long Salt Creek; isolating the drain because it is designated under a different title, would not serve the purpose of the Flood Control Act. We recognize if Parker Drain were independent of Salt Creek there would be no need to obtain a permit.

The record shows that the DNR has interpreted IC 13–2–22–13(d) consistently to include streams and drains that are ten (10)

miles or less in length from the stream or drain's headwater to their mouths; if any project undertaken upon a stream or drain whose inclusive length was over ten (10) miles, the DNR required a permit. The Parker Drain has no headwater or mouth except that of Salt Creek. The NRC is correct; the interpretation of a statute by the administrative agency charged with its enforcement is entitled to great weight. *Bender v. State ex rel. Wareham* (1979), 180 Ind.App. 236, 239, 388 N.E.2d 578, 581; *Terre Haute Savings Bank v. Indiana State Bank* (1978), 177 Ind.App. 690, 694, 380 N.E.2d 1288, 1291.

■ The Drainage Board's purpose is clearly to maintain and keep free from obstruction, the county drainage system. However, when a municipality's purpose overlaps with that of a State agency, the municipality or agency which is in the best position to judge the larger effects of the situation should control. The DNR has a legitimate interest in policing projects on State creeks and streams. The permit program is part of this policing process. The DNR is in a much better position, than are we or the Porter County Drainage Board, to determine the effects the excavation and dredging will have on the Salt Creek as a whole. The Salt Creek is important to the ecological balance of the State's fisherys; accordingly, the Parker Drain is as well. The permit process allows them to make these types of determinations.

We find that the Porter County Drainage Board is required to obtain a permit from the DNR, and a determination of the effects the project will have must be made before a permit is granted. The goals the Flood Control Act seeks to achieve and the underlying policies are not being contravened by this decision; this will not unduly encumber the Parker County Drainage Board. The decision to embark upon this project was made in 1986, and no action was taken until July of 1989. To first obtain a permit is not a burden upon the county drainage boards, but would be in the best interest of all.

Reversed for proceedings consistent with this opinion.

MILLER, P.J., and BAKER, J., concur.